Please be seated everyone. All right, for our first argument today Michael Reck against Wexford Health and others, appeal number 19-2440. We have counsel in person. Okay we'll proceed first with counsel for plaintiff. May it please the court. My name is Elsa Andriani-Vahanana and I'm appearing on behalf of appellant Michael Reck. Over a seven-month period beginning in July of 2015, Mr. Reck suffered a series of painful complications due to his uncontrolled Crohn's disease. Crohn's disease is an autoimmune condition that can result in painful complications. In Mr. Reck's case, he suffered perianal fistula and abscess that would continue to burst open with blood and pus repeatedly over the seven-month period in question. As laid out in gory detail in the briefing, Mr. Reck repeatedly sought care for his condition and was even brought to the health care unit at Menard Correctional where he was incarcerated on an emergency basis due to his condition and related symptoms including constant rectal bleeding, draining and pus and blood, bloody stool, and debilitative pain until the issue was finally resolved through surgery seven months later in February of 2016. In granting summary judgment to the defendants on Mr. Reck's deliberate indifference claims, the district court acknowledged the seriousness of Mr. Reck's condition but overlooked evidence demonstrative of factual disputes. I placed the overlooked evidence into four categories. The first of which is evidence demonstrating that Dr. Trost delayed in referring Mr. Reck to a specialist and insisted on pursuing ineffective antibiotic treatment leading to undue prolonged pain and delayed resolution of his condition. The evidence includes first that Reck complained of his symptoms in July of 2015. When he was finally able to see Dr. Trost on September 1st, Dr. Trost informed him that he would be referred to a specialist. Yet no such referral was made promptly. In fact, Mr. Reck was not referred to surgery until three months later on December 28th. Dr. Hellerstein opined in her expert opinion that this constituted avoidable delay. The recognition of a specialist was acknowledged on September 1st but didn't happen for months inexplicably. It's a little more complicated than that, right? Because Mr. Reck saw Dr. Trost again on October 2nd and at that time I thought Trost started the collegial review process for a GI specialist but not a surgeon yet, right? That is correct. So one of the questions that I hope you'll address, and I'll leave you to decide how and when, but in essence my question is whether the opting for a GI consultation and colonoscopy as of early October rather than a surgeon yet amounts to disagreement about how best to care for someone or it reflects deliberate indifference. That is correct, Your Honor. Dr. Trost did make a referral for a specialist in October but context is important here. Mr. Reck first displayed symptoms in July of 2015. So per Dr. Hellerstein's expert report, perhaps a GI referral would have been appropriate in September after he'd already been suffering for eight weeks. But didn't Dr. – can I just pause you on that? Because I think it goes to the point you're making. Didn't Dr. Hellerstein also observe that it was, quote, a reasonable course of action to begin or to first try to address the symptoms with the prescription medication? That is correct, Your Honor. She did – So if Dr. Hellerstein is saying that it's a reasonable course of action to start with a prescription during this – from the September to October time period, it's hard to see how there's deliberate indifference at least before you get to October. By Trost. Yeah, yeah, yeah. By Dr. Trost. Dr. Trost did not start those treatments until October. Dr. Hellerstein declined that by September the fistula had burst. But wasn't there – I don't remember the name of it – Laquaville or something? I might have the medication wrong – that was prescribed in the month of September? Yes. In the month of September he received an antibiotic called Levaquin N-Potassin. Dr. Hellerstein opined that at that time his condition required referral to a GI specialist. That would have been appropriate. But by October the condition had exacerbated. He had repeatedly appeared in the health care unit bloodied such that surgery was apparent by October. But instead of referring him to surgery, he referred him to a GI specialist. So we have all those September emergencies in between. That is correct. I also think it's important to note that Dr. Trost himself indicated that on September 1st a specialist referral was needed. He acknowledged that himself. So the delay for the GI specialist referral for four weeks can be an indicia of deliberate delay – deliberate indifference. That paired with the delay of referral to surgery, which also did not occur until December 28th. I would also highlight that in the intervening months he experienced several emergencies demonstrating that Levaquin N-Potassin in the conservative course of treatment was ineffective. He complained of constant rectal bleeding. The antibiotics expired after 14 days and yet there was no improvement in his condition. And yet Dr. Trost persisted in the course of treatment and subsequently ordered two more rounds of antibiotics, although they had proven to be ineffective. And cases in this circuit have demonstrated that persisting in a course of treatment that's ineffective can also constitute deliberate indifference. The second category of evidence that was overlooked by the district court pertains to Nurse Smith and her failure to treat, examine, and refer Mr. Reck to a physician despite being brought to the health care unit on an emergency basis. This also can amount to deliberate indifference. She did not demonstrate enough regard for Mr. Reck and his serious condition to even examine him. And Dr. Hellerstein was clear in her opinion that this was below the standard of care. It's in violation of administrative directives which require nurses to examine patients and their indications when they appear in the health care unit. And she failed to do so, resulting in unnecessary pain and prolonged delay. The third category of... Just one quick clarification there. Was Nurse Smith present for all four of the September crises or just some of them? Nurse Smith was present for two of the incidents in September, on September 2nd and then again on September 17th. Between October and when he received surgery, she saw him again twice. He was suffering some of the same issues and yet again she failed to examine him. It was not a single incident of failing to address his symptoms. It reflected a pattern. The third category of evidence that I would highlight that was overlooked by the district court relates to staffing of the health care unit. The record amply demonstrates that there were staffing issues at Menard. During the period in question, there were 1.5 positions short of what was expected under the contract. In addition, 2,260 hours of work for physicians, nursing practitioners and other nursing positions went unfilled. This was a systemic issue at Menard, and Dr. Trost only further exacerbated the issue by not showing up. He himself missed nearly 250 hours and this affected Mr. Reck's treatment personally. There were several instances in the record in which doctors were no show. He would arrive on an emergency basis in the health care unit. When you say doctors were a no show, does the record show that Dr. Trost missed scheduled appointments with the plaintiff? The record indicates that doctors were a no show, at least on one occasion. It's apparent from the record that it might not have been Dr. Trost that did not show up. There was another part-time doctor, I believe Dr. Boutalid is his name, who did not show up. So when you talk about absenteeism, which I totally get why you're talking about it, I think you're right too. When you talk about absenteeism and you talk about understaffing, don't you have to connect it to the treatment Mr. Reck received or didn't receive? That is correct, Your Honor, and I think the record shows, or a jury could reasonably infer, that Dr. Trost's absences affected Reck personally. Okay, how? If I could highlight... How? Yes, Your Honor. If I could highlight, between September 1st and October 2nd, Mr. Reck appeared in the health care unit on multiple occasions, but never saw a physician, even though it was an emergency. Nurse Smith herself testified that because of Dr. Trost's absences, she was forced, and other nurses were forced, to confront issues that perhaps would be best left to a physician. But there were 24-hour periods, Nurse Smith testified, in which no doctor was present. There was no doctor to consult. Nurse Smith also testified she had no experience or training with Crohn's disease, and she did not know what a fistula looked like. She would have benefited from a doctor being present. That would have facilitated her care of Mr. Reck, and Mr. Reck also would have personally benefited from seeing a physician in the period of September through October 2nd. And again, I would note that when he finally did get an appointment on September 27th, the doctor was a no-show, which is indicative of Wexford's failure to adequately staff, affecting Mr. Reck personally. I had understood your argument on understaffing, and at least, whether you can establish individual liability on that, I don't know. But with respect to the policy and custom claim against Wexford, I had understood your argument to be, in essence, that you've got lots of evidence over lots of time here, including July, August, September, October, and on and on, where you've got the understaffing was 2,000 hours unfilled in the third quarter, and the canceled appointments with Reck and with others, the nurse who is overburdened, the internal documents that are in the cumulatively, that shows that it would at least allow a jury to infer that Reck and others got substandard care as a result. That is correct, Your Honor. In addition, I would also highlight the Wellman case, which is another example in which cumulative incidents, a series of incidents of no-shows or inadequate staffing were sufficient to show that there was deliberate indifference. The last category of evidence that I would highlight that the district court overlooked pertains to the defendant's failure to adequately respond to sick call requests. Inmates, when they have a health care issue, are to submit their requests via a sick call. There's ample evidence in the record that demonstrates that there was an issue with the sick call system. In a quality assessment, Menard scored a zero out of five in terms of responding to sick call requests in an adequate manner. Under the administrative director and the Wexford contract, adequate response is logging the request within 24 hours and being seen by a medical care professional within 72 hours. That's on the systemic level. With respect to Mr. Reck in particular, the record demonstrates that he submitted at least five sick call requests from the period of July to September that went unanswered. As a result, his Crohn's disease, his fistula and abscess grew uncontrolled and he never sought, received, he never received treatment from anyone, a nurse or a physician. So on this aspect of his claims, are you sure he sued the right defendants? Because the reason I say that is it's the correctional officers, is it not, that would pick up the tickets from the, when he puts them in the cell bars? It's not any of the named defendants that would shoulder that responsibility. So even if you credit his version of events, the requests weren't making their way to the medical unit. That way, how were any of the Yes, Your Honor. I would add that in addition to correctional officers, nurses making rounds were also responsible for picking up sick call requests. That was the testimony of health care administrator Walls, who oversaw the nurses and was responsible for overseeing the sick call system. Like walking, walking cell to cell and picking them up through the bars or emptying the, that box at the end of the floor? Both. Nurses could do both. And when they're making their medical rounds, they could pick up through the bars, the sick call requests. And Walls testified that she was responsible for the nurses who worked for the state who did that. In addition, the contract for Wexford provided that they were to handle the sick call system. So they're also responsible for that. Looking at it systemically, I mean, this is one of these challenges of dealing with diffused responsibility. But it looks, are you arguing that systemically, in essence, Wexford and the Department of Corrections divided responsibility for these tasks? Some nurses work for Wexford, some work for DOC, et cetera. And we don't know who's responsible on any given day. And in essence, if the system fails someone like Mr. Rec, no individual is responsible or accountable. I would acknowledge that it was a hybrid site and there were employees who were employees of Wexford and there were also employees of the state. But that does not abdicate Administrator Walls of her responsibility to monitor the sick call system and oversee her nurses when she testified that she was well aware that the sick call system was in ways inadequate and there were requests submitted through the bars that were not necessarily logged. The same goes true, the same is true for Wexford who was responsible for providing health care and administering the sick call system. Although they're not employers of all of the nurses who work there, they played some role and were responsible for the sick call system. And unless there's further questions, I reserve the remaining of my time for rebuttal. Okay, thank you very much. And for defendants, Mr. Wimmer. Good morning and may it please the court. My name is Alex Wimmer on behalf of Dr. John Wimmer. In the course of the district court decision finding Mr. Reck failed to provide evidence to prove Dr. Trost and Wexford were deliberately indifferent either through the medical treatment provided to Mr. Reck or through the design and maintenance of the health care unit systems at Menard. My co-defendant will address Mr. Reck's arguments regarding the state defendants. Here, summary judgment was appropriate since neither Wexford nor Dr. Trost were deliberately indifferent to Reck's serious medical needs through the design, maintenance, or implementation of the Menard sick call system. First, there's no evidence that Wexford or Dr. Trost created or oversaw the sick call system. Wexford requires its employees to conduct the sick call system at Menard. So we should blame DOC for these problems? Well, your honor, I wouldn't take a position on that. What I would say is that the administrative directives are derived from IDOC. They're created by IDOC and Wexford has to comply pursuant to the contract. Wexford's involvement in the administration of the sick call system was limited by the administrative directives authored by the IDOC. As came out in the deposition of Dr. Maddox, no Wexford physicians participated in review of the sick call system. IDOC and Wexford nurses handled properly submitted sick call requests, but the management audits that the IDOC administrative directives were being followed were performed by the IDOC, and if there were any issues in those audits, they were referred to the warden and other IDOC employee. So what do we do with the, for example, the zero out of five score stands out in my mind. I know it's just part of the internal reviews that I thought were between Wexford and DOC. If I recall correctly, your honor, Ms. Laurent explained, I apologize, I can't remember if it was Ms. Laurent or Ms. Walls explained that the zero out of five score in that report indicated that there was less than 85 percent inclusion, and if it was more than 85 percent, it would have been a three out of five. So I think the zero out of five is a little bit misleading in the sense that it sounds like they were doing nothing when it could have been an 84 percent success rate. It sounds like an unacceptable performance level though. They certainly, Wexford certainly felt like it was unacceptable and wanted to change it, and they took steps to do so. Even if we take Mr. Wreck's allegations of the sick call requests that he submitted through July, from July through September as being accurate, as your honor pointed out, Mr. Wreck chose to submit these requests by putting them in the cell bars as opposed to submitting them in a lockbox that's specifically designed for that purpose. Mr. Wreck himself said that he didn't even know if they were received by the health care unit or if they ever reached the lockbox. That was, however, part of the system, correct? It was part of the system. Walls testified that's an acceptable way to submit a request. That's correct. He was able to submit it that way, that's correct, but she did also testify that the preferred method was by submitting it through the lockbox that they passed every day on their way to eat or to go to the yard. I'm just curious, I don't mean to sidetrack, has this problem been fixed today that you know of? I mean that something's gone wrong, right? Where if the system allows you to put the request in the bars and then time and time again it's somehow not making its way to the medical unit, there's some kind of breakdown there. I don't know if the administrative directives continue to allow to put them in the bars or not. I don't have an answer to that question at this time, Your Honor. It's not the putting in the bars that's troubled me, it's that when the person puts them in the bars they don't end up making their way to the medical unit somehow, some way. I don't know where they end up. Your Honor is correct. I don't know if that's an issue with the correctional officers that are handling picking those up or the nurses. This is the responsibility point. I mean something's gone awry. I understand, Your Honor. Regarding Wexford, they had no policies or procedures that were deliberately indifferent to the needs of the prisoners as they related to the sick call system because Wexford followed the administrative directives of the IDOC and no Wexford physician monitored the sick call system. Moving on to Rex's claims of understaffing of the HCU by Wexford and Dr. Trost. Dr. Trost testified that he had no personal involvement in the staffing at Menard. It was not his job to recruit staff. It was not his job to fill positions. Dr. Trost had no control over the staffing there. Additionally, Mr. Rex's medical records do not indicate a single instance where Dr. Trost's absences, whether allowed or not, had any effect on Mr. Rex's care. There were several instances that plaintiff points to in their briefs. On September 27th, Rex was scheduled to be seen but the physician was not there. Rex's own notes indicate that he was supposed to see Dr. Putalid that day. However, Rex was seen both before and after this visit, just a few days prior on September 24th and then on October 2nd by Dr. Trost, where he examined and referred Mr. Rex for a colonoscopy and a GI consultation as well as prescribing the antibiotic Levaquin and the pain reliever ibuprofen. Mr. Wimmer, let me just raise a concern with you about the staffing issue. It may also describe the sick call request problems, but the defense seems to be that those people who knew about the problems were not empowered to solve them and that people who would have been empowered to solve them didn't know about them. I don't agree that our position is that the people that were empowered to solve them did not know about them. I think that there were audits done that showed there was a staffing issue, as you indicated with the audits, hours that were missing. However, it is the defense position that the people that were empowered to do something about it did. Not only was... Well, so the usual standard, at least as I understand the law under the Eighth Amendment, is that where an actor has, under some color of state law, has actual knowledge of these sorts of problems, they are required to take reasonable steps in response. It doesn't have to be perfect, it's not a guarantee of success, but why isn't the reasonableness of those responses a jury issue in this case? Well, we would assert that the only evidence as far as the responses that they took was that they took reasonable responses, that they took reasonable actions. Did they consider raising salaries for the positions that they were hiring for? They did. There was testimony that they provide generous salaries, that they provide generous vacation hours, that they offered signing bonuses, 401k plans. None of this was enough. It would seem that, at least for the few months that Mr. Reck was treated in 2015 and 2016, they were unsuccessful. I will note that just before Mr. Reck's complaints began, one physician unexpectedly quit and another went on medical leave. So they were left in a difficult position where they had to immediately fill roles that they weren't expecting to have to fill. Could I ask you, one of the points that's come up has to do with the contractual incentives when shifts went unserved, in essence, and you all have said in your brief that the contract required a rebate in those situations. Is it correct that Ms. Lauren testified about a change in the contract procedures for that at some relevant time here, in terms of who had to initiate the rebate? I believe that what Ms. Lauren testified to was that what she referred to as a performance adjustment would be requested by the state if they felt that Wexford was not performing as required under the contract, and it would be up to the state to request that performance adjustment where Wexford would then have to pay back money that they had been prepaid. Well, and what would have to be paid back? Would it be salary? Would it be a prorated portion of the larger contract with overhead, etc.? I believe it would be pursuant to the Schedule E that Ms. Lauren talked about that states the amount of hours, and then there would be a prorated amount that would have to be paid back. That's my understanding. And how would that compare to Wexford's actual costs? For the amount of hours that would need to be paid back versus the total amount of hours that Wexford has throughout the state of Illinois, I think it would be a small amount. But Your Honor's point brings me to another point. It simply defies logic that Wexford would have a customer policy in place that was detrimental to its own finances in the sense that they... Well, the question I'm asking is how detrimental was it actually if the state had to initiate the process, if and when it found out about it, and depending on how big the adjustments would have to be. Sure. Because it obviously wasn't enough to prompt Wexford to take effective measures over these months to fix a very serious understaffing problem. Well, I'm not sure that there's evidence that the court could consider that effective measures were available to them. Or if more measures had been taken that they didn't take, that someone would have been hired. Plaintiff presented no evidence that... You think plaintiff has to prove that? No, I just don't think that there's any evidence here. I don't think it's on the plaintiff to prove it. However, Wexford did provide evidence that they took significant measures to try to hire people and throughout that approximately five, six, seven months were unable to find people to fill those positions. However, they were eventually filled. But I would also point out that even if plaintiff can prove and the court accepts that there was a staffing deficiency that Wexford or Dr. Trost knew about, that they didn't take any steps to fix that staffing deficiency, again, Mr. Redkiss failed to prove or present evidence that he was harmed by those staffing deficiencies. Because the sole instances where staff was unavailable for him were not Dr. Trost. And there's no evidence that it was a Wexford problem. And when he was... Sorry, wait a minute. No evidence it was a Wexford problem? I don't believe that it was a problem with Wexford's staffing because he was seen within the next few days after those instances. So on January 11th, he was scheduled to see Dr. Lockhart. And then on January 17th, he was scheduled for medication renewals, but he was seen several days later on January 24th. So Mr. Redkiss failed to prove that the delay from January 11th through January 24th harmed him in some way. I want to just ask you to address one last thing. And that is your brief and the state's brief seem to be saying that... You're highlighting that Mr. or at least in some instances evidence that delays made him sicker. Now that we can... There's maybe room for debate about that. But I understood the plaintiff's theory to be here that delays in essence reflected or caused him unnecessary avoidable pain over this period of months. And that that's the principal harm, at least once it got to the point where surgery was going to be inevitable. I think that you're right that the plaintiff makes that claim. However, the evidence shows the experts, Dr. Gage and Dr. Hellerstein. Dr. Gage stated that the delays in treatment, the alleged delays in treatment in this case were perfectly reasonable that you could expect the same or similar delays in a public, outside of prison. And Dr. Hellerstein opined that the October 2nd referrals did not harm REC in any way. So... But Hellerstein... Well, nobody likes a colonoscopy, right? But presumably that was necessary. It didn't worsen his condition. But I thought Hellerstein was pretty clear that the delay in the surgery was still very much a problem. He certainly said that a delay in the surgery was outside the standard of care. However, I don't believe he made an opinion on whether or not REC's pain was outside of normal during those times or if he had excessive pain during that time. Excessive pain. Okay, thank you. And as I see that my time has expired... Okay. Thank you, Mr. Wimmer. Next, Mr. Griffiths. For the state defendants. Thank you, Your Honor. May it please the court. Assistant Attorney General Carson Griffiths on behalf of state defendants Gail Walls and Tanya Smith. There is no evidence that state defendants acted with deliberate indifference to REC's condition. Neither of them knew about REC's complaints or his condition, his fistula, or his complaints about his treatment until after he was discharged. As an administrator and a nurse respectively, Walls and Smith were entitled to defer to Dr. Trost's treatment decisions. And there was no evidence that they knew those decisions posed an obvious risk of harm to Mr. REC. How about on the sick call procedure? What were Walls' responsibilities with respect to that? Well, with respect to the sick call system generally, Ms. Walls did supervise that. However, she didn't know about Mr. REC's specific complaints that his July and August kites were lost until she received his first grievance on September 9th. And at that point, he was already in the care of Dr. Trost. He had already seen medical staff, and he was scheduled for a follow-up appointment later that month. So until she had actual knowledge of any deficiencies or Mr. REC's alleged complaints, the Eighth Amendment does not require her to do any medical care. And that's exactly what this court held in Hays. She comes across on the record as somebody who knows a lot about everything, but really has no responsibility for anything. Is that basically what you pay her to do? I disagree that she's not responsible for anything, Your Honor. She had a lot of duties to ensure, in her participation in the Quality Improvement Committee, monitoring staff vacancies and other issues like that. She also was responsible to responding to grievances about the health care system, which she did for Mr. REC in this case. She also took on extra responsibilities when the director of nursing position was unfilled and took on the duty of scheduling nurses to cover open shifts and other things. What does the record have to say about her knowledge of the deficiencies in the sick call system with respect to the placement of requests to be seen through the bars? There's no evidence that she was aware of any of that specific deficiency, Your Honor. And specifically with respect to the Quality Improvement Committee, what she was aware of was the time from when a sick call slip is collected until an offender was able to see a physician. And she clarified that the Quality Improvement Committee didn't look at the specific problem that Mr. REC had, where he's claiming... Who is it that testified that there were problems between the bars aspect of the system? Well, Mr. REC testified to that, that his sick call request went unanswered in July and August 2015. But we really don't know who picked up the sick call clips, whether they were lost by a correctional officer who picked those up, whether they were lost by a Wexford nurse, whether they were lost by a department nurse, whether there was a data entry error like there was for Mr. REC's July 26th sick call request. And more importantly, as an individual defendant and an individual claim here, Ms. Walls certainly had no actual knowledge of Mr. REC's complaints about his care until after he had been seen by Dr. Trost. And then at that point, she says, well, Mr. REC is being cared for. Dr. Trost has prescribed medication and a follow-up appointment. He's being seen and cared for. I'd also like to note that in the Quality Improvement Committee meeting minutes, which are Exhibit 2 to Mr. REC's response to the motion for summary judgment, there's no reflection in those minutes that Mr. REC's complaint in July and August 2015 was a regular systemic problem in any way. There are actual notes about grievances that were found to be meritorious or warranting further review, and none of those describe Mr. REC's situation specifically. And again, we don't have a systemic claim against the state defendants here. We have individual claims which require personal involvement and actual knowledge. So just that they had nothing to do with it. As the contract points out, they were ultimately responsible for the sick call system, ensuring that offenders were seen. I do agree that, and also, Wexford did employ nurses who were responsible for triaging sick call requests and picking up sick call slips. So it was a split site where there are some state nurses, some of Wexford nurses, no state doctors. So I don't think it's as easy to say that it was over the sick call system. It sounds like you're suggesting that we ought to remand the case and let you and Wexford duke it out as to who has what responsibility for the sick call system. You're both, you're pointing like this at each other. No, Your Honor, and I don't think that this case could be remanded against the individual defendants that have been sued here. Because again, Ms. Walls has to have actual knowledge of Mr. REC's complaints about the perfect candidate for a remand. See no evil, hear no evil, don't know anything about anything. Well, it's up to Mr. REC to prove his case, Your Honor. He did have the benefit of counsel in this case. There was extensive discovery conducted. He could have discovered who was the individual responsible for these lost July and August 2015 kites, if in fact they were lost. And he did not. And so he's left with the individual defendants. I'm trying to imagine what that discovery would look like. It could be. How many dozens of correctional officers and nurses would have to be deposed to figure that out? Many, Your Honor. That would be something. There's never been any assertion in this case that Mr. REC didn't have ample opportunity for discovery. I'd point out also. But district judges are also expected to manage a discovery in a proportional way. And we've got to try to manage the law in such a way that these claims and rights can be addressed, rights can be protected, defendants can be exonerated, in essence, civilly if that's appropriate at reasonable costs. And what you're describing is the system with diffuse responsibility, the need to take dozens and dozens of depositions, which I'm reasonably confident would produce an answer in every single deposition, not me. Well, Your Honor, I think that there are other discovery tools that would be available to plaintiffs, such as interrogatories. Which would turn up more information. Well, they would turn up information that then the plaintiff could identify who could be deposed. But in any event, again, turning back to this case briefly, we're dealing with individual defendants and individual claims against them. Actual knowledge, personal involvement are key. Could I ask you to address Nurse Smith's conduct in September of 2015 and compare that with the case of Berry against Peterman, where there are limits to the extent to which a nurse can deflect responsibility to physicians? Right. So I think that, first of all, I'd like to point out, with respect to the September visits by Mr. Reck to Nurse Smith specifically, Dr. Trost, at the outset of that month, set a timeline for Mr. Reck to come back to see him. And that was 30 days. So he prescribed medication. Mr. Reck didn't receive that medication that day. He received it a few days later, according to his journal. And in that time, I see my time's expiring. Please go ahead and answer the question. In that time, Nurse Smith sees Mr. Reck, observes that his condition is generally stable. He's complaining about drainage and pain from the fistula. Generally stable when he's brought in on an emergency basis with constant rectal bleeding. Correct. Yes. She described that he, you know, And she doesn't examine it. She doesn't examine it. Well, she didn't physically examine the fistula itself, Your Honor. Correct. She did look at his His vital signs were stable. Noted that Dr. Trost had looked at the fistula. And also, two other nurses around the same time looked at the fistula, observed no active drainage, and it looked like a healed boil, and declined to refer Mr. Reck to Dr. Trost immediately. So we have a situation there where she's looking at him, determining pain and drainage are normal symptoms of a fistula. He's experiencing pain and drainage. She gives him gauze, which both experts agreed was helpful in relieving the discomfort associated with the drainage, as well as antibiotic ointment, and told him to keep it clean and dry until he could see Dr. Trost again. And so that's different than Peterman, where the nurse is essentially treating an inmate on her own, refusing to refer him to a physician, and there's no sign. Also, that was a dental care case, and he wasn't seen by a dentist. So that's another distinguishing factor. Here we have a doctor who's actually treating Mr. Reck, who's qualified to treat him, and Nurse Smith didn't have any indication that that treatment was causing him harm. Thank you, Mr. Griffiths. Let's see. So Ms. Andriani Fahananak, we gave the other side a little extra time, so take five minutes for rebuttal if you need it. On rebuttal, I would first like to address the contention raised by defendants that his condition was not exacerbated. There was no evidence in the record that over the seven-month period his condition was not exacerbated and Mr. Reck did not suffer additional pain. I think there is a record, 158-6. In the initial sick call request, he complained of tenderness, swelling, pain. In August, his sick call requests indicate that he's complaining of hot to the touch and inflammation. However, by September 17th, in Supplemental Appendix 9, he's complaining of constant rectal bleeding and that he's passing out from the pain. And indeed, in Supplemental Appendix 59 and Supplemental Appendix 20, by November 16th, he is saying his pain escalated to 8 out of 10. And finally, by November, instead of the gauze he was receiving in September, he was given adult diapers. From these facts, a reasonable jury could infer that, in fact, his condition was exacerbated and he did experience increased pain. Counsel, did anyone other than your client testify that there had been problems with respect to the between-the-bars system of sick call request? Yes, Your Honor. I believe Administrator Walz testified in her deposition that, although she conceded that submitting sick call requests through the bars was acceptable, there was not always a guarantee that that request would be recorded. In doing so, she acknowledged that there was a serious problem with the system, that although this was an acceptable method to submit sick call requests, she conceded in her deposition that there was no guarantee that they would be recorded. So you disagree with the representation made by the Assistant Attorney General to us just a few minutes ago. Am I right? That is correct, Your Honor. I believe Mr. Administrator Walz did testify to the issues with submitting sick call requests through the bars. Thank you. I would also highlight... Can I ask you for a clarification on that? I think Judge Ripple's question is important. Does her deposition testimony, though, say in the relevant time period, this would largely be pre-September in this fact pattern, that she had knowledge that, yeah, these requests that get put in the bars, they hardly ever make it to the medical unit or they make it there with a lot of infrequency, and I knew that. In other words, it's one thing to acknowledge the problem, right? We have a problem here, we've got to fix it. But it's another thing to acknowledge that I knew about the problem at the time it was happening, you know, and as it affected Mr. Reck. Yes, Your Honor. I don't think she stated it in that way. I believe that she said there's no guarantee that the sick call request would be logged, but I interpret it in the same way that you do, which is that this is an admission of the issue, an acknowledgement that there is a problem with respect to the sick call system, and particularly with respect to requests submitted through the bars. I would also acknowledge and highlight that defendants in their time acknowledged that submission through the bars was an acceptable method, and so that is not in dispute here. And finally, I would push back on the contention from defendants that no one can be responsible. There is an effort here to pass the buck, and I think there is ample evidence in the record from which a jury could infer that each of the defendants were responsible for both the sick call system and the understaffing, and some of those include the Wexford contract, and that Walls herself was responsible for overseeing nurses and the sick call system. Likewise, Wexford employed nurses who were tasked with picking up sick call requests, as such, for defendants to suggest that they can shrug off any responsibility. I think a reasonable jury could disagree. And if there are no further questions, I would respectfully ask the court to reverse the summary judgment decision below. Our thanks to all counsel for the helpful presentations this morning, and our thanks, Ms. Andriani Fahanana, for you and your firm's willingness to take on this case at the court's request. The case has taken